No. 13-1360

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

―――――――――――――――――――――

**RICHARD G. TATUM, individually and on behalf of a class of all other persons similarly situated,**

*Plaintiff-Appellant,*

*v.*

**RJR PENSION INVESTMENT COMMITTEE; RJR EMPLOYEE BENEFITS COMMITTEE; R.J. REYNOLDS TOBACCO HOLDINGS, INC.; R.J. REYNOLDS TOBACCO COMPANY,**

*Defendants-Appellees.*

―――――――――――――――――――――

**Appeal from the United States District Court
for the Middle District of North Carolina
*The Honorable N. Carlton Tilley, Jr., District Judge***

―――――――――――――――――――――

**PAGE-PROOF BRIEF OF APPELLEES**

―――――――――――――――――――――

> Daniel R. Taylor, Jr.
> Adam H. Charnes
> Richard D. Dietz
> Chad D. Hansen
> Thurston H. Webb
> **KILPATRICK TOWNSEND & STOCKTON LLP**
> 1001 West Fourth Street
> Winston-Salem, NC  27101
> (336) 607-7300

*Counsel for Appellees*

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

## <u>CORPORATE DISCLOSURE STATEMENT</u>
### (Fed. R. App. P. 26.1 and 4th Cir. R. 26.1)

Appellee RJR Pension Investment Committee makes the following disclosures:

| | |
|---|---|
| 1. Is Appellee a publicly held corporation or other publicly held entity? | ☐ YES ☑ NO |
| 2. Does Appellee have any parent corporations? | ☐ YES ☑ NO |
| 3. Is 10% or more of the stock of Appellee owned by a publicly held corporation or other publicly held entity? | ☐ YES ☑ NO |
| 4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? | ☐ YES ☑ NO |
| 5. Is Appellee a trade association? | ☐ YES ☑ NO |
| 6. Does this case arise out of a bankruptcy proceeding? | ☐ YES ☑ NO |

/s/ Adam H. Charnes
Adam H. Charnes
KILPATRICK TOWNSEND &
   STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 607-7300

*Counsel for Appellee RJR Pension Investment Committee*

-i-

## CORPORATE DISCLOSURE STATEMENT
### (Fed. R. App. P. 26.1 and 4th Cir. R. 26.1)

Appellee RJR Employee Benefits Committee makes the following disclosures:

1. Is Appellee a publicly held corporation or other publicly held entity?

☐ YES
☑ NO

2. Does Appellee have any parent corporations?

☐ YES
☑ NO

3. Is 10% or more of the stock of Appellee owned by a publicly held corporation or other publicly held entity?

☐ YES
☑ NO

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?

☐ YES
☑ NO

5. Is Appellee a trade association?

☐ YES
☑ NO

6. Does this case arise out of a bankruptcy proceeding?

☐ YES
☑ NO

/s/ Adam H. Charnes
Adam H. Charnes
KILPATRICK TOWNSEND &
    STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 607-7300

*Counsel for Appellee RJR Employee Benefits Committee*

## CORPORATE DISCLOSURE STATEMENT
### (Fed. R. App. P. 26.1 and 4th Cir. R. 26.1)

Appellee R.J. Reynolds Tobacco Holdings, Inc. makes the following disclosures:

1. Is Appellee a publicly held corporation or other publicly held entity?  ☐ YES  ☑ NO

2. Does Appellee have any parent corporations?  ☑ YES  ☐ NO

Reynolds American Inc.

3. Is 10% or more of the stock of Appellee owned by a publicly held corporation or other publicly held entity?  ☑ YES  ☐ NO

Reynolds American Inc.

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES  ☑ NO

5. Is Appellee a trade association?  ☐ YES  ☑ NO

6. Does this case arise out of a bankruptcy proceeding?  ☐ YES  ☑ NO

/s/ Adam H. Charnes
Adam H. Charnes
KILPATRICK TOWNSEND &
   STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 607-7300

*Counsel for Appellee R.J. Reynolds Tobacco Holdings, Inc.*

## **CORPORATE DISCLOSURE STATEMENT**
### **(Fed. R. App. P. 26.1 and 4th Cir. R. 26.1)**

Appellee R.J. Reynolds Tobacco Company makes the following disclosures:

1. Is Appellee a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does Appellee have any parent corporations? ☑ YES ☐ NO

Indirect parent is Reynolds American Inc.

3. Is 10% or more of the stock of Appellee owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? ☐ YES ☑ NO

5. Is Appellee a trade association? ☐ YES ☑ NO

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO

/s/ Adam H. Charnes
Adam H. Charnes
KILPATRICK TOWNSEND &
   STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 607-7300

*Counsel for Appellee R.J. Reynolds Tobacco Company*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES……………………………………………..… vii

INTRODUCTION ................................................................................................1

STATEMENT OF THE FACTS ..........................................................................4

SUMMARY OF ARGUMENT ............................................................................9

ARGUMENT ......................................................................................................12

    I.    THE DISTRICT COURT'S CAUSATION HOLDING
        IS CORRECT ........................................................................12

        A.    The Correct Causation Inquiry is Whether the
            Investment was Objectively Prudent .......................................13

        B.    Tatum's "Would Have" Theory is Inconsistent
            With ERISA and Unworkable in Practice ................................17

        C.    A Hypothetical Prudent Fiduciary Would Have
            Decided to Divest the Nabisco Funds From the
            Plan...........................................................................................20

            1.    Tatum has failed to satisfy his burden of
                proving causation..........................................................20

            2.    Regardless of which party has the burden of
                proof, a hypothetical prudent fiduciary
                would have divested the Nabisco Funds ......................24

                a.    RJR had a duty to divest the Nabisco
                      Funds because they were
                      undiversified, non-employer funds……………..24

        b.     The facts found by the district court establish a hypothetical prudent fiduciary would have divested the Nabisco Funds.……………………………………..28

II.     THE DISTRICT COURT'S ERRONEOUS PROCEDURAL PRUDENCE RULING IS AN ALTERNATIVE GROUND FOR AFFIRMANCE ...........................33

     A.     The Procedural Prudence Standard is Context-Specific and the Required Investigation Varies Based on the Underlying Facts. .................................33

     B.     Under the Correct Standard, the District Court's Findings Show Tatum Failed to Prove a Breach of Procedural Duty. .........................................37

          1.     RJR satisfied its procedural duties pre-spinoff.........................................................37

          2.     RJR satisfied its procedural duties post-spinoff.........................................................42

III.    THE DISTRICT COURT'S ERRONEOUS CONCLUSION THAT RJR IS A FIDUCIARY IS AN ALTERNATIVE GROUND TO AFFIRM.........................................47

     A.     ERISA's Standard for Functional Fiduciary.............................47

     B.     RJR was Not a Functional Fiduciary With Regard to the Elimination of the Nabisco Funds .................................49

IV.    THE DISTRICT COURT'S REJECTION OF PROFESSOR LYS' TESTIMONY IS NOT REVERSIBLE ERROR .......................................................54

V.     THE DISTRICT COURT CORRECTLY DISMISSED THE TWO PLAN COMMITTEES ....................................................56

VI.    THE DISTRICT COURT DID NOT ABUSE ITS
       DISCRETION BY DENYING TATUM LEAVE TO
       AMEND HIS COMPLAINT ............................................................60

CONCLUSION ..................................................................................63

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE
REQUIREMENT

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Allison v. Bank One-Denver*, 289 F.3d 1223 (10th Cir. 2002) ................................22

*Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728 (7th Cir. 2006)..................26

*Beck v. PACE Int'l Union*, 551 U.S. 96 (2007) ...............................................21

*Becker v. Weinberg Grp., Inc. Pension Trust*, 473 F. Supp. 2d 48
   (D.D.C. 2007)........................................................................................36

*Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12 (1st Cir. 1998).......................47

*Boucher v. Williams*, 13 F. Supp. 2d 84 (D. Me. 1998) .........................................57

*Brieger v. Tellabs, Inc.*, 629 F. Supp. 2d 848 (N.D. Ill. 2009) ...............................40

*Brink v. DaLesio*, 667 F.2d 420 (4th Cir. 1981) ........................................... 23, 24

*Brock v. Robbins*, 830 F.2d 640 (7th Cir. 1987) ....................................................16

*Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283 (D. Mass. 2008),
   *aff'd*, 555 F.3d 1 (1st Cir. 2009) ....................................... 18, 33, 34, 36

*Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286 (5th Cir. 2000)..................................16

*Carbon Fuel Co. v. USX Corp.*, 100 F.3d 1124 (4th Cir. 1996)..............................56

*Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54 (4th Cir. 1992)........................48

*Coyne & Delany Co. v. Blue Cross & Blue Shield of Va.*, 102 F.3d
   712 (4th Cir. 1996)..............................................................................58

*DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410 (4th Cir. 2007) ........................ passim

*DiFelice v. U.S. Airways, Inc.*, 397 F. Supp. 2d 758 (E.D. Va. 2005) ...................48

*Doe v. Bayer Corp.*, 344 F. Supp. 2d 466 (M.D.N.C. 2004)..................................59

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999) ................................56

*Fink v. National Savings & Trust Co.*, 772 F.2d 951 (D.C. Cir. 1985)...................16

*Franklin v. First Union Corp.*, 84 F. Supp. 2d 720 (E.D. Va. 2000) .....................36

*Franks v. Ross*, 313 F.3d 184 (4th Cir. 2002)..........................................................60

*Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323 (9th Cir. 1985) (*per curiam*), overruled en banc on other grounds by Cyr v. Reliance Standard Life Ins. Co.*, 642 F.3d 1202 (9th Cir. 2011)................................. 49, 53

*Goodman v. Praxair, Inc.*, 494 F.3d 458 (4th Cir. 2007) ......................... 61, 63

*Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000) ........................................................................................................21

*Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009) ......................... 36, 53

*In re Mut. Funds Inv. Litig.*, 403 F. Supp. 2d 434 (D. Md. 2005)..........................48

*In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156 (1st Cir. 2009) .........................................................................................................55

*In re RCN Litig.*, No. 04-5068 (SRC), 2006 WL 753149 (D.N.J. Mar. 21, 2006) ......................................................................................................59

*In re Schering-Plough Corp. ERISA Litig.*, 420 F.3d 231 (3d Cir. 2005)...........................................................................................................34

*In re Unisys Sav. Plan Litig.*, 173 F.3d 145 (3d Cir. 1999)............................ 16, 54

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Skinner Engine Co.*, 188 F.3d 130 (3d Cir. 1999) ...................................22

*Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452 (7th Cir. 2010) .........................48

*Krupski v. Costa Crociere*, 130 S. Ct. 2485 (2010)........................................ 61, 63

*Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir. 1995)........................................ 16, 17, 22

*Leckey v. Stefano*, 501 F.3d 212 (3d Cir. 2007)........................................................20

*Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905 (7th Cir. 2013) ................54

*Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209 (2d Cir. 1987).........................23

*Lundy v. Adamar of N.J., Inc.*, 34 F.3d 1173 (3d Cir. 1994) .................................62

*Madonia v. Blue Cross & Blue Shield of Va.*, 11 F.3d 444 (4th Cir. 1993)..............................................................................................59

*Martin v. Feilen*, 965 F.2d 660 (8th Cir. 1992) ....................................22

*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409 (2d Cir. 1999)..............................................................................23

*McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234 (5th Cir. 1995)...........................................................................................22

*Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) ............................... 48, 57

*Minn. Laborers Health & Welfare Fund v. Scanlan*, 360 F.3d 925 (8th Cir. 2004) ..................................................................................58

*Minor v. Bostwick Labs., Inc.*, 669 F.3d 428 (4th Cir. 2013) .................................58

*Murray v. United States*, 215 F.3d 460 (4th Cir. 2000).................................... 20, 33

*N.Y. State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*, 18 F.3d 179 (2d Cir. 1994) .............................................24

*NLRB v. Amax Coal Co., Div. of Amax, Inc.*, 453 U.S. 322 (1981) .......................48

*Noa v. Keyser*, 519 F. Supp. 2d 481 (D.N.J. 2007) ......................................... 34, 39

*Peabody v. Davis*, 636 F.3d 368 (7th Cir. 2011) ......................................22

*Pegram v. Herdrich*, 530 U.S. 211 (2000)...............................................47

*Plasterers' Local Union No. 96, Pension Plan v. Pepper*, 663 F.3d 210 (4th Cir. 2011)............................................................... passim

*Renfro v. Unisys Corp.*, 671 F.3d 314 (3d Cir. 2011).............................................17

*Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915 (8th Cir. 1994) ............ 14, 16, 23

*Schaffer v. Weast*, 546 U.S. 49 (2005), *aff'g* 377 F.3d 449 (4th Cir. 2004)..................................................................................21

*Schloegel v. Boswell*, 994 F.2d 266 (5th Cir. 1993) ................................53

*Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98 (2d Cir. 1998)......................22

*Simmons v. Pilgrim*, No. 2:09-CV-121, 2010 WL 4683745 (N.D.W. Va. Nov. 10, 2010)..................................................................58

*Sommers Drug Stores Co. Emp. Profit Sharing Trust v. Corrigan Enters., Inc.*, 793 F.2d 1456 (5th Cir. 1986)........................... 48, 49, 51

*Stein v. Smith*, 270 F. Supp. 2d 157 (D. Mass. 2003) ..............................59

*Steinman v. Hicks*, 352 F.3d 1101 (7th Cir. 2003) ...................................26

*Summers v. State Street Bank & Trust Co.*, 453 F.3d 404 (7th Cir. 2006)............................................................................. 26, 29

*Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.*, 320 F.3d 1213 (11th Cir. 2003) .........................................................54

*Taylor v. ANB Bancshares, Inc.*, No. 08-5170, 2010 WL 4054362 (W.D. Ark. Sept. 20, 2010)................................................................58

*Taylor v. Peoples Natural Gas Co.*, 49 F.3d 982 (3d Cir. 1995)..................... 50, 53

*Trustees of the Graphic Commc'ns Int'l Union Upper Midwest Local 1M Health & Welfare Plan v. Bjorkedal*, 516 F.3d 719 (8th Cir. 2008)........................................................................................53

*U.S. Life Ins. Co. v. Mechs. & Farmers Bank*, 685 F.2d 887 (4th Cir. 1982)................................................................................ 21, 22

*United States v. Davis*, 690 F.3d 226 (4th Cir. 2012)...............................54

*United States v. Infelice*, 506 F.2d 1358 (7th Cir. 1974) .........................55

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) ............................................47

*Walsh v. Principal Life Ins. Co.*, 266 F.R.D. 232 (S.D. Iowa 2010) .....................53

*White v. Marshall & Ilsley Corp.*, 714 F.3d 980 (7th Cir. 2013) ...........................26

*Willett v. Blue Cross & Blue Shield of Ala.*, 953 F.2d 1335 (11th Cir. 1992).................................................................................................22

*Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090 (9th Cir. 2004)...... 16, 18, 22, 36

## **Statutes and Rules**

29 C.F.R. § 2550.404a-1(b)(2)(i) ...........................................................18

29 U.S.C. § 1002(21)(A)..........................................................................47

29 U.S.C. § 1002(9) ........................................................................... 57, 59

29 U.S.C. § 1104 .......................................................................................12

29 U.S.C. § 1104(a)(1)(B) .......................................................................33

29 U.S.C. § 1104(a)(1)(C) ................................................................ passim

29 U.S.C. § 1104(a)(2)........................................................................ 6, 25

29 U.S.C. § 1107(d)(3)..............................................................................25

29 U.S.C. § 1109(a) .......................................................................... passim

29 U.S.C. § 1132(a)(2)...................................................................... 47, 57

Fed. R. Civ. P. 15(c)(3).................................................................. 60, 61, 62

## **Other Authorities**

Restatement (Third) of Trusts § 227 (1992) ...........................................31

Restatement (Third) of Trusts § 227 cmt. e (1992) ...............................27

Restatement (Third) of Trusts § 227 cmt. f (1992)................................29

## **INTRODUCTION**

Companies are not required to offer retirement plans to their employees. But if they do, the Employee Retirement Income Security Act of 1974 ("ERISA") guarantees employees that fiduciaries overseeing company retirement plans will make prudent decisions about plan investment options to help preserve their retirement savings. In this appeal, Richard Tatum asks the Court to ignore this core ERISA principle and award tens-of-millions of dollars in lost profits for a decision the district court found prudent—a finding Tatum does not now challenge.

This case arose after RJR Nabisco spun off RJR in 1999 in part to limit Nabisco's exposure to billions of dollars of tobacco liability. At the time, RJR Nabisco's 401(k) plan offered seven diversified funds, and two employer single-stock funds invested in publicly traded RJR Nabisco and subsidiary stock. Single-stock funds are extremely risky, and many courts consider them imprudent *per se* in employee retirement plans. But ERISA expressly permits *employer* single-stock funds, and thus it is common for companies to offer investment funds in retirement plans that invest solely in their own stock.

Following the spinoff, the RJR Nabisco 401(k) plan was split. The post-spinoff RJR 401(k) plan offered six diversified funds, an RJR single-stock fund, and two single-stock funds invested in the now-unrelated Nabisco companies.

-1-

Concerned about the risk of the non-employer, single-stock Nabisco Funds, the fiduciaries decided to freeze and later remove them altogether from the RJR plan.

Tatum brought this ERISA action asserting that RJR breached its procedural duty to adequately investigate the decision to remove the Nabisco Funds. Tatum asked the district court to ignore this Court's precedent and adopt a causation standard that required RJR to prove that, absent the procedural breach, a prudent fiduciary *would have* made the identical decision. The district court rejected that argument and applied this Court's causation standard—simply, whether the ultimate decision, viewed objectively, was prudent. The court found RJR committed a procedural breach, but also found the decision to remove the highly risky, non-employer, single-stock Nabisco Funds was objectively prudent and therefore did not cause any loss to plan participants.

On appeal, Tatum does not challenge the district court's finding that removal of the Nabisco Funds was objectively prudent. Instead, he renews his "would have" causation argument, insists RJR failed to show a prudent fiduciary necessarily would have reached the same decision, and seeks remand. As explained below, that is not the standard applied in this circuit. In any event, the district court's factual findings show RJR prevails even under Tatum's "would have" standard.

Moreover, there are several alternative grounds on which this Court should affirm the judgment for RJR. First, the need to divest the Nabisco Funds was so obvious that RJR's investigation far exceeded what was necessary under ERISA. The district court ignored the contextual nature of ERISA's procedural obligations and applied cases involving decisions to *keep* employer, single-stock funds in a retirement plan. However, the decision to keep a fund in the face of a dramatically falling stock price—leaving participants at risk of losing most or all of their retirement savings—requires substantially greater procedure than the decision to *protect* participants by removing a risky fund that is falling in value. In the latter circumstance, fiduciaries are merely carrying out ERISA's command that they "minimize the risk of large losses" to the plan. 29 U.S.C. § 1104(a)(1)(C).

Second, ERISA breach of fiduciary duty suits can be brought only against ERISA fiduciaries. RJR is not a named fiduciary and the district court wrongly concluded that it was a "functional fiduciary" merely because some company employees made plan decisions. The trial evidence proved those employees were acting on behalf of the plan fiduciaries (who were not named in this lawsuit) and RJR did not exercise any control over those decisions. Accordingly, the district court should have entered judgment for RJR because it is not a fiduciary under ERISA.

-3-

## STATEMENT OF THE FACTS

After the bench trial, the district court found the following facts.

RJR and Nabisco merged in 1985 and formed a new company, RJR Nabisco

Holdings Corp. ("RN"). But in 1999, largely due to concerns of tobacco lawsuit

liability, RN decided to separate its food and tobacco businesses by spinning off

the tobacco company. Prior to the spinoff, RJR Nabisco owned 100% of R.J.

Reynolds Tobacco Co. ("RJRT") and 80.5% of Nabisco Holdings Corp. ("NA");

the remainder of NA was publicly owned:

**PRE-SPINOFF STRUCTURE**



-4-

(DX_13_at_RJR1598.)

The spinoff separated the food and tobacco businesses. RJRT, the tobacco company, became wholly owned by publicly traded R.J. Reynolds Tobacco Holdings, Inc. ("RJRTH")[1]; and the publicly traded food holding company became Nabisco Group Holdings Corp. ("NGH"). NA remained 19.5% owned by public stockholders. (Dkt._437_at_3-4.)

**POST SPINOFF STRUCTURE**



(DX_13_at_RJR1598.) As a result of the spinoff, shareholders of the former RN owned stock in two separate companies: NGH and RJRTH.

The spinoff also affected the retirement plans offered by the two new companies. Prior to the spinoff, RN offered a 401(k) retirement savings plan, the

---

[1] RJRTH and RJRT are defendants in this case and are referred to collectively as "RJR."

RJR Nabisco Plan, to its employees that contained a number of diversified investment options, such as mutual funds. And as is typical of many publicly traded companies, the RJR Nabisco Plan also offered employer, single-stock investment funds in its two employer stocks, RN and NA. (Dkt._437_at_7 n.3.)

In March 1999, before the spinoff, a "working group" primarily of RN human resources, benefits, and legal employees met several times to discuss issues related to the spinoff, including what changes should be made to the retirement plans of the new RJR company. (Dkt._437_at_10-12.) After a 30-60 minute discussion, the participants concluded that the new RJR 401(k) plan ("the Plan") should not offer the two single-stock Nabisco Funds (NGH and NA) as ongoing investment options, mainly due to their high risk and the concern that they would not fall within ERISA's exception to diversification for single-stock *employer* funds, *see* 29 U.S.C. § 1104(a)(2), because Nabisco would be an unrelated company. (Dkt._437_at_12-13.)

The working group recommended that the Nabisco Funds should be frozen at the time of the spinoff so no new investments could be made, and then divested approximately six months after the spinoff. Participants would be given notice and an opportunity to voluntarily exit the funds, and could select from among the other prudent investment options in the Plan, including fully diversified mutual funds. (Dkt._437_at_13.) The working group relayed these recommendations to members

-6-

of the RN Employee Benefits Committee ("EBC") and Pension Investment

Committee ("PIC"), two named fiduciaries of the RJR Nabisco Plan.  Members of

those committees discussed, agreed with, and adopted the working group's

recommendation.  (Dkt._437_at_13-14.)

The spinoff was effective June 1999.  After the spinoff, the concerns about

the excessive risk of Nabisco's stocks proved accurate.  RJR was facing massive

potential tobacco lawsuit liability, including concerns of a "multibillion dollar

punitive damages award" so large "there was fear that RJR would go bankrupt"

and the tobacco plaintiffs would then seek to collect the judgment from NGH.

(Dkt._437_at_19.)  In addition, the value of NA also declined due to poor

performance of food sector stocks.  As a result, during the third quarter of 1999

alone, the NGH fund dropped 22.1% and the NA fund 18.8%.  (Dkt._437_at_28.)

And with the continued risk of massive tobacco lawsuit liability and bleak food

sector outlook, there were serious concerns Nabisco's stocks would drop further.

(Dkt._437_at_65.)

In and after October 1999, members of the RJR PIC and EBC, along with

their staff, discussed the scheduled divestiture of the Nabisco Funds on several

occasions.  These experienced human resources and benefits employees and in-

house lawyers remained concerned Nabisco's stock prices would continue to fall

"and never rebound."  (Dkt._437_at_21-23.)  The participants also expressed

-7-

concerns that a very high percentage of employees did not actively monitor their 401(k) investments and that losses in the Nabisco Funds could wipe out the entire retirement savings of many employees. Given the unacceptably high risk of the undiversified, single-stock Nabisco Funds, the meeting participants stood by the earlier decision to divest the funds approximately six months after the spinoff. (Dkt._437_at_23.) At the time of the sale on January 31, 2000, NGH had fallen 60% since the spinoff, and NA had fallen 28%. (Dkt._437_at_30.)

In March 2000, NGH received an unexpected, unsolicited takeover bid from business magnate Carl Icahn. (Dkt._437_at_30-32.) Neither NGH nor the financial markets anticipated Icahn's takeover bid. Indeed, just days before, Salomon Smith Barney, a major Wall Street investment firm, issued a report describing the continued prospects of Nabisco's stocks without any mention of a possible takeover. (Dkt._437_at_32-33.) Moreover, no restructuring was expected because if NGH initiated any restructuring or sale within two years, the spinoff transaction could lose its tax-free status. (Dkt._437_at_6.) The bidding war that resulted from Icahn's takeover attempt caused the prices of the NGH and NA stocks to appreciate dramatically. (Dkt._437_at_31.)

Several years later, Tatum brought this putative class action, seeking lost profits for the forced divestiture of the Nabisco Funds on the ground that the sale was a breach of the Plan fiduciaries' ERISA duty of prudence. After a five-week

bench trial, the district court entered judgment for RJR. The court reasoned that, although RJR breached its procedural duties by failing to fully investigate the elimination of the Nabisco Funds, the decision to sell the funds was objectively prudent and therefore that sale did not cause any loss to the Plan. (Dkt._437_at_65-77.)

## SUMMARY OF ARGUMENT

The district court's judgment should be affirmed for several reasons.

*First*, the district court's causation holding is correct. Even if an ERISA plaintiff proves a breach of procedural duties, the fiduciary is liable only for "losses to the plan *resulting from* each such breach." 29 USC § 1109(a) (emphasis added). In *Plasterers' Local Union No. 96, Pension Plan v. Pepper*, 663 F.3d 210, 217-19 (4th Cir. 2011), this Court held that this causation element of an ERISA claim is not satisfied if the ultimate decision by the fiduciaries was objectively prudent.

Here, the district court held that the decision to remove the Nabisco Funds was objectively prudent, and Tatum does not challenge that finding on appeal. The overwhelming evidence at trial showed that the Nabisco Funds exposed Plan participants to unacceptably high levels of risk. Indeed, many courts consider non-employer, single-stock funds like the Nabisco Funds imprudent *per se*. Moreover, even if the Court accepts Tatum's "would have" theory of causation, the district

court's findings demonstrate a hypothetical prudent fiduciary would have removed the Nabisco Funds in this case.

*Second*, even if this Court rejects the district court's causation holding, the Court should affirm on the alternative ground that Tatum failed to prove a breach of procedural prudence.  The district court erred by applying cases involving decisions to *keep* employer, single-stock funds while the price of company stock was falling dramatically.  A decision to leave participants exposed to "the risk of large losses," 29 U.S.C. § 1104(a)(1)(C), obviously requires greater analysis than one that effectuates the statutory command "to minimize" such risks, *id*.  Here, the grounds for eliminating the highly risky Nabisco Funds were so strong that RJR's investigation satisfied ERISA.  Indeed, at trial, Tatum presented no evidence that *any* fiduciary of any plan at any company *ever* included a single-stock fund of an unrelated company as a matter of fiduciary discretion.

*Third*, the Court also can affirm on the alternative ground that RJR is not an ERISA fiduciary.  RJR is not a named fiduciary and the district court wrongly concluded it was a "functional fiduciary" because some company employees made Plan decisions.  The trial evidence proved those employees were acting on behalf of the Plan fiduciaries and RJR did not exercise any control over Plan decisions.

*Fourth*, the district court's rejection of the testimony of Thomas Lys, one of Tatum's experts, was not an abuse of discretion.  The district court did not exclude

his testimony; rather it found Lys' testimony entitled to little weight because Lys admitted he was unfamiliar with the applicable ERISA standard. In any event, that testimony supported the standard ultimately adopted by the district court based on Tatum's other experts, and thus was harmless.

*Fifth*, the district court did not err by dismissing the RJR PIC and EBC, two of the committees consisting of ERISA Plan fiduciaries. By statute, only a "person" can be sued for breach of fiduciary duty, and the statutory definition of "person" does not include committees made up of plan fiduciaries. Congress's decision to exclude committees from the definition of "fiduciary" makes sense because committees have no assets against which to satisfy a judgment and there is no legal basis for holding the committee's individual members, or the corporate employer, liable for a judgment against the committee itself.

*Finally*, the district court did not abuse its discretion by denying Tatum's motion for leave to amend the (already twice amended) complaint to add the individual Plan fiduciaries. The statute of limitations had long expired on claims against the individual fiduciaries and therefore the amendment would be futile unless it could relate back to the initial filing. The district court was well within its discretion in concluding the individual members could not reasonably have known Tatum intended to sue them and therefore the relation-back doctrine could not apply.

-11-

Accordingly, the district court's judgment should be affirmed.

## ARGUMENT

## I. THE DISTRICT COURT'S CAUSATION HOLDING IS CORRECT.

Under ERISA, fiduciaries that breach their duty of prudence are "personally liable to make good to such plan any losses to the plan *resulting* from each such breach." 29 U.S.C. § 1109(a) (emphasis added). Thus, as this Court has held, "while certain conduct may be a breach of an ERISA fiduciary's duties under 29 U.S.C. § 1104, that fiduciary can only be held liable upon a finding that the breach actually caused a loss to the plan." *Plasterers*, 663 F.3d at 217.

In addition, ERISA does not dictate which particular investment options a fiduciary must provide to plan participants; instead, ERISA requires only that all investment options be prudent. *Id*. at 217-18. Thus, as this Court explained in *Plasterers*, even if the fiduciary's decision-making process were inadequate, if the decision was "objectively prudent," then it cannot have caused any loss to the plan because plan participants received the prudent investment options that ERISA requires. *Id*. at 218.

Here, consistent with *Plasterers* and countless cases from other circuits, the district court entered judgment for RJR because it found the decision to divest the exceedingly risky, non-employer, single-stock Nabisco Funds was objectively prudent. (Dkt._437_at_65-66.) On appeal, Tatum focuses relentlessly on the

-12-

district court's statement that "a hypothetical prudent fiduciary *could* have"—instead of *would* have—"decided to eliminate the Nabisco Funds on January 31, 2000." (Dkt._437_at_75-77.) Tatum insists the district court should have determined what a hypothetical fiduciary "would have" done in this circumstance. But as explained below, the district court's ruling correctly applied this Court's "objective prudence" standard from *Plasterers*—a standard that is widely applied by courts in other circuits as well. And, in any event, the district court's factual findings—which Tatum does not challenge on appeal—support its judgment even if this Court ignored the *Plasterers* standard and applied Tatum's "would have" causation standard.

### A.    The Correct Causation Inquiry is Whether the Investment was Objectively Prudent.

Relying on a selective, out-of-context quotation in *Plasterers*, Tatum argues that the causation analysis turns on whether a hypothetical prudent fiduciary *would have* made the same decision absent the procedural breach.   (Tatum Br. 19.)  This is wrong.

In *Plasterers*, the fiduciaries blindly chose to invest the entire plan assets solely in bank certificates of deposit to "avoid the risk of losing money," without considering other investment vehicles. 663 F.3d at 212-13. The fiduciaries even refused to hear from a financial advisor who recommended a more diversified approach. *Id*. This Court agreed with the district court that the fiduciaries

-13-

breached their procedural duty to investigate other investment options.  *Id*. at 216-17.

But this Court held "[i]t is not enough, then, for the district court to have found that a breach of fiduciary duty occurred because the Former Trustees failed to investigate investment options.  The Former Trustees can only be held liable for losses to the Plan *actually resulting* from their failure to investigate."  *Id.* at 218 (emphasis added).  As a result, "in order to hold the [defendants] liable for damages based on their given breach of fiduciary duty, the district court must first determine that the [defendants'] investments were imprudent."  *Id.* at 217.

The Court then used the word "would," but did so as part of a discussion emphasizing that the causation determination turns on whether the investment was prudent or imprudent, not whether a fiduciary would have (rather than could have) taken a particular action:

> [T]he mere fact that the Former Trustees failed to investigate alternative investment options does not mean that their actual investments were necessarily imprudent ones.  [¶]  "Even if a trustee failed to conduct an investigation before making a decision, he is insulated from liability [under § 1109(a)] if a hypothetical prudent fiduciary would have made the same decision anyway."  *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994).  "It is the imprudent investment rather than the failure to investigate and evaluate that is the basis of suit."

*Plasterers*, 663 F.3d at 218 (alteration in original) (footnote omitted).  The Court concluded by holding that "[b]ecause the court never found that the failure to

-14-

investigate investment options led to imprudent investments or otherwise found that the investments were objectively imprudent, its analysis lacked the essential element of causation." *Id.* at 219.

Then, of critical importance to this issue, the Court remanded with instructions "to determine *the prudence* of the Former Trustees' actual investments." *Id.* (emphasis added).  The Court identified a variety of factors the district court should use to determine prudence, but emphasized that it expressed "no opinion as to what factual findings the court will make or how that will influence its decision as to whether the Former Trustees' investment of the Plan's assets *was prudent*." *Id*. (emphasis added).

This language is critical because it flatly contradicts Tatum's claim that the standard is whether a prudent fiduciary necessarily would have made the same decision.  This Court did not remand with instructions to decide if a hypothetical prudent fiduciary *would have* bought bank CDs as opposed to the alternatives.  Instead, the Court remanded for the district court to determine "whether the Former Trustees' investment of the Plan's assets *was prudent*." *Id*.

Simply put, *Plasterers* does not hold that district courts must decide whether a hypothetical fiduciary in a particular case would have made the same decision absent the procedural breach.  Instead, *Plasterers* holds the district court must determine whether the decision was "objectively" prudent or imprudent.  Of

-15-

course, as a practical matter, this analysis involves use of a "could have" standard, in the sense that the determination turns on whether the fiduciary's decision, when viewed objectively, is one a hypothetical prudent fiduciary could have made—*i.e.*, a decision that is "objectively prudent."  But the important point is that this Court's analysis ultimately turns solely on whether the decision was objectively prudent.

This Court's use of the "objectively prudent" causation standard is consistent with the law in other circuits.  As then-Judge Scalia explained in a concurrence whose reasoning has since been adopted by the Third, Fifth, Sixth, Eighth, and Ninth Circuits:

> I know of no case in which a trustee who happened—through prayer, astrology or just blind luck—to make (or hold) objectively prudent investments (*e.g.*, an investment in a highly regarded "blue chip" stock) has been held liable for losses from those investments because of his failure to investigate and evaluate beforehand.

*Fink v. National Savings & Trust Co.*, 772 F.2d 951, 962 (D.C. Cir. 1985) (Scalia, J., concurring in part and dissenting in part).[2]  And although different courts use different phrasing, the decision always turns not on what a hypothetical fiduciary would do, but on whether the fiduciary's decision, viewed objectively, was

---

[2] The following decisions have relied on the reasoning in then-Judge Scalia's concurrence in *Fink*: *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004); *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 300 (5th Cir. 2000); *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 153-54 (3d Cir. 1999); *Kuper v. Iovenko*, 66 F.3d 1447, 1459-60 (6th Cir. 1995); *Roth*, 16 F.3d at 919; *Brock v. Robbins*, 830 F.2d 640, 646 (7th Cir. 1987).

prudent. *See, e.g.*, *Renfro v. Unisys Corp.*, 671 F.3d 314, 322 (3d Cir. 2011);

*Kuper*, 66 F.3d at 1459-60.

If this Court applies the "objective prudence" causation test from *Plasterers*,

it readily can affirm without reaching any of the other issues raised in this appeal.

After detailed fact finding, the district court expressly held that RJR's decision to

divest the Plan of the Nabisco Funds "was an objectively prudent decision."

(Dkt._437_at_65.)  Tatum does not challenge this factual finding on appeal,

instead resting his entire argument on the district court's failure to determine

whether a prudent fiduciary "would have" made the same decision.  Because

Tatum does not demonstrate the objective prudence finding was clear error—

indeed, does not even challenge that finding—the Court should affirm the district

court on this ground, rendering the remaining issues raised by the parties moot.

### B.    Tatum's "Would Have" Theory is Inconsistent With ERISA and Unworkable in Practice.

Tatum's "would have" causation standard also suffers from a second fatal

flaw:  it is impractical, if not impossible, to apply.  By requiring the fact finder to

decide which of several prudent options a hypothetical fiduciary *would have*

chosen, it forces the fact finder to decide which prudent option was the *most*

prudent.  But asking a fact-finder to determine which of several prudent options

was the "most" prudent is inherently arbitrary.  Fact-finders are not permitted to

rely on hindsight in ERISA cases, *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410,

424 (4th Cir. 2007), so they cannot simply examine which investment option ultimately performed "best." And that analysis would be improper in any event, because fiduciaries are not obligated to maximize returns when selecting investment options. *Wright*, 360 F.3d at 1100; *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 287 (D. Mass. 2008), *aff'd*, 555 F.3d 1 (1st Cir. 2009). Instead, ERISA fiduciaries must choose prudent investment options "taking into consideration the risk of loss and the opportunity for gain … associated with the investment." 29 C.F.R. § 2550.404a-1(b)(2)(i).

In balancing risk and return, two fiduciaries might choose two entirely different investment options yet both have acted prudently. Indeed, Tatum's own expert conceded that "in certain circumstances, one investor might believe it is prudent to buy a stock and another investor might believe it is prudent to sell the stock, and both investors might be prudent." (Dkt._437_at_76.) In these circumstances, there are no non-arbitrary means for a fact-finder to choose which of various prudent options a hypothetical prudent fiduciary "would have" selected at the time.

Finally, Tatum and his supporting amici also argue a "could have" standard—*i.e.*, a straightforward objective prudence test—significantly narrows the scope of fiduciary liability for failure to investigate, which in turn could undermine ERISA's fiduciary duties and remove incentives for plan fiduciaries to conduct

-18-

thorough investigations.  (Tatum Br. 36-38; AARP/NELA Br. 14-21; Labor Br. 22-24.)  But this Court expressly rejected that argument in *Plasterers*, noting that Congress believed "[i]f trustees act imprudently, but not dishonestly, they should not have to pay a monetary penalty for their imprudent judgment so long as it does not result in a loss to the Fund."  663 F.3d at 217-18.   The Court explained that "honest but potentially imprudent trustees are adequately deterred from engaging in imprudent conduct by the knowledge that imprudent conduct will usually result in a loss to the fund, a loss for which they will be monetarily penalized."  *Id*.

Moreover, the monetary penalties Tatum seeks in this lawsuit are one of several remedies available for a breach of procedural prudence under ERISA.  For example, § 1109(a) permits "other equitable or remedial relief" based on a fiduciary's breach without requiring proof that the procedural breach caused monetary loss.  Here, however, Tatum made a strategic decision to pursue only monetary relief (Dkt._414_at_148), and this Court squarely has held that monetary relief is unavailable where the fiduciary's decision was objectively prudent.  *Plasterers*, 663 F.3d at 217-18.

-19-

C.    **A Hypothetical Prudent Fiduciary Would Have Decided to Divest the Nabisco Funds From the Plan.**

Even if the Court were to ignore *Plasterers* and apply Tatum's "would have" causation standard, the district court's judgment should be affirmed because its fact findings support the judgment even under Tatum's "would have" standard.

1.    **Tatum has failed to satisfy his burden of proving causation.**

As an initial matter, this Court recognized in *Plasterers* that the circuits are split on who bears the burden of proof on causation, but did not address the issue.[3] 663 F.3d at 220. The district court held RJR bore the burden because "[t]his approach is the most fair considering that a causation analysis would only follow a finding of breach." (Dkt._437_at_64.) This Court reviews this legal determination *de novo. Murray v. United States*, 215 F.3d 460, 463 (4th Cir. 2000). As explained below, the district court erred by placing the burden of proof on causation—an element of Tatum's claim—on RJR.

First, this Court has recognized that liability under § 1109(a) is dependent upon a finding of causation, *i.e.* it is an element of the claim. *Plasterers*, 663 F.3d at 217; *see also Leckey v. Stefano*, 501 F.3d 212, 225-26 (3d Cir. 2007) (noting causation is an element of a claim under § 1109(a)).

---

[3] The Court must address this question only if it rejects RJR's "objective prudence" argument. Because Tatum does not dispute the district court's finding that removing the Nabisco Funds was objectively prudent, it is irrelevant which party bore the burden of proof on that question.

It is hornbook law that plaintiffs bear the burden to prove the elements of a statutory cause of action. *Schaffer v. Weast*, 546 U.S. 49, 56 (2005), *aff'g* 377 F.3d 449 (4th Cir. 2004). Indeed, this Court has held that "[w]hen a statute is silent, the burden of proof is normally allocated to the party initiating the proceeding and seeking relief." *Schaffer*, 377 F.3d at 452. Therefore, Tatum, as the plaintiff seeking to impose liability under § 1109(a), bears the burden to prove each element of that claim, including causation.

Second, placing the burden of proof on a plaintiff to prove causation is supported by trust law. Trust law serves as a backdrop to ERISA, *Beck v. PACE Int'l Union*, 551 U.S. 96, 101 (2007), and offers a starting point for analysis of the statute, *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 250 (2000). Tatum suggests trust law would place the burden on the defendant to disprove causation (Tatum Br. 21), but this Court has rejected the "novel proposition that, whenever a breach of the obligation by a trustee has been proved, the burden shifts to the trustee to establish that any loss suffered by the beneficiaries of the trust was not proximately due to the default of the trustee." *U.S. Life Ins. Co. v. Mechs. & Farmers Bank*, 685 F.2d 887, 896 (4th Cir. 1982). Rather, the Court held "[t]he beneficiary must bear the burden of proving that the act or omission of the trustee has caused a diminution of the trust income or

principal." *Id.* Thus, trust law supports placing the burden to prove causation on the plaintiff.

Third, the vast majority of other circuits, including the Second, Third, Sixth, Seventh, Ninth, Tenth, and Eleventh, place the burden of proof on the plaintiff to prove causation under § 1109(a). *See Peabody v. Davis*, 636 F.3d 368, 378 (7th Cir. 2011); *Wright*, 360 F.3d at 1099; *Allison v. Bank One-Denver*, 289 F.3d 1223, 1239 (10th Cir. 2002); *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Skinner Engine Co.*, 188 F.3d 130, 148 (3d Cir. 1999); *Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98, 105-06 (2d Cir. 1998)[4]; *Kuper*, 66 F.3d at 1459; *Willett v. Blue Cross & Blue Shield of Ala.*, 953 F.2d 1335, 1343 (11th Cir. 1992).

While Tatum points to two circuits that place the burden on the defendant (Tatum Br. 20), both instituted a burden-shifting approach in cases involving *self-dealing*. *See McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 235 (5th Cir. 1995) (shifting the causation burden where plaintiff alleged that trustee obtained improper personal benefits); *Martin v. Feilen*, 965 F.2d 660, 671-72 (8th

---

[4] The Secretary of Labor distinguishes *Silverman* by arguing that, unlike its plaintiff, Tatum showed a breach and a prima facie case of loss. (Labor Br. 18-19.) However, the district court never found Tatum proved a prima facie case of loss.

Cir. 1992) (shifting the causation burden where plaintiff alleged trustee conflict-of-interest).[5]

A breach of fiduciary duty based on self-dealing is inherently different from a breach based on a failure to investigate. Indeed, self-dealing cases justify placing the burden of proof on the fiduciary "because the fiduciary has a virtual monopoly of information concerning the transaction in question [and] is in the best position to demonstrate the absence of self-dealing." *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1215 (2d Cir. 1987). Trust law likewise shifts the burden in instances of self-dealing based on this same justification. *See, e.g.*, *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 420-21 (2d Cir. 1999). Here, there are no allegations of self-dealing. As explained above, RJR was motivated by its desire to eliminate an exceedingly risky single-stock fund from its employees' retirement plans. *See supra* at 6-8. Tatum presented no evidence to suggest RJR benefited financially from that decision.

Finally, citing *Brink v. DaLesio*, 667 F.2d 420 (4th Cir. 1981), Tatum claims this Court recognized a "general principle that a breaching fiduciary should bear the burden of disproving loss." (Tatum Br. 21.) But *Brink* addressed which party had the burden of proof regarding the *extent of damages*, not causation. 667 F.2d

---

[5] While some courts have relied on these cases to impose a burden-shifting approach in cases not involving self-dealing, *see, e.g.*, *Roth*, 16 F.3d at 917, they failed to consider the unique need for burden shifting in self-dealing cases.

at 426; *see also N.Y. State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*, 18 F.3d 179, 182 (2d Cir. 1994) (noting *Brink* "discussed the burden of proof issue with respect to damages"). Further, as the Secretary of Labor acknowledged (Labor Br. 14), *Brink* was based on allegations of self-dealing.

In sum, this Court should follow the vast majority of circuits and hold, consistent with ordinary burden of proof principles and trust law, that plaintiffs bear the burden to prove causation under § 1109(a). For the reasons discussed *infra* 24-33, Tatum failed to satisfy his burden of proving a hypothetical prudent fiduciary would have maintained the Nabisco Funds in the Plan.

> **2. Regardless of which party has the burden of proof, a hypothetical prudent fiduciary would have divested the Nabisco Funds.**

Regardless of who bears the burden of proof on causation, the Court should affirm because the evidence found by the district court proved a hypothetical prudent fiduciary would have divested the Nabisco Funds from the Plan.

> **a. RJR had a duty to divest the Nabisco Funds because they were undiversified, non-employer funds.**

First, RJR was *required* by law to divest the Nabisco Funds from the Plan. ERISA requires a prudent fiduciary to ensure investments are properly diversified. This requirement arises under two separate duties. First, a fiduciary has an express duty to "diversify[] the investments of the plan so as to minimize the risk of large

-24-

losses." § 1104(a)(1)(C). And second, as part of a fiduciary's duty of prudence, the fiduciary is required to ensure funds are properly diversified. *See* § 1104(a)(2).

There is only one exception to this diversification requirement: an "eligible individual account plan," the most common of which is an Employee Stock Ownership Plan ("ESOP"). 29 U.S.C. §§ 1104(a)(2), 1107(d)(3). ESOPs are investment options in which a company's employees invest in their employer's stock. These investments are, by their nature, single-stock funds and therefore very risky. But as this Court has noted, although an ESOP is itself generally imprudent based on a lack of diversification, Congress made a policy decision to favor investing in employer stocks and permit this type of otherwise imprudent investment. *DiFelice*, 497 F.3d at 425.[6]

Moreover, the requirement that a plan be diversified extends to each investment option within a plan. *Id.* at 423. Thus, although RJR offered many fully diversified, prudent investment options in its Plan, that did not excuse RJR from its duty to ensure that each Plan option, including the single-stock Nabisco Funds, was itself sufficiently diversified. *Id.* As the Court explained in *DiFelice*:

---

[6] Tatum, citing *DiFelice*, claims this Court has rejected any "bias" against holding a single-stock fund. (Tatum Br. 33.) But *DiFelice* stands for exactly the opposite proposition—that *employer*, single-stock funds are permissible *only* because ERISA expressly creates an exception for ESOPs. 497 F.3d at 424-25. *DiFelice* even questioned the policy behind that exception, but noted this was a decision for Congress. *Id.*

-25-

> This is so because a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds, which individuals may *or may not* elect to combine with a company stock fund, could theoretically, in combination, create a prudent portfolio. To adopt the alternative view would mean that any single-stock fund, in which that stock existed in a state short of certain cancellation without compensation, would be prudent if offered alongside other, diversified Funds.... This result would be perverse in light of the Department of Labor's direction that selection of prudent plan *options* falls within the fiduciary duties of a plan administrator.

*Id.* at 423-24; *see also White v. Marshall & Ilsley Corp.*, 714 F.3d 980, 996 (7th Cir. 2013) ("The availability of other options does not necessarily excuse offering one imprudent investment. ERISA imposes a duty of prudence with regard to every offering.").

It is widely accepted by courts that single-stock funds are *very* risky and generally inconsistent with the risk-adverse preferences of participants. *See Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 409 (7th Cir. 2006) ("Because the value of any single stock or bond is tied to the fortunes of one company, holding a single kind of stock or bond is very risky."); *Steinman v. Hicks*, 352 F.3d 1101, 1104 (7th Cir. 2003) (same). Indeed, some courts consider single-stock funds *per se* imprudent. *See, e.g., Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 732 (7th Cir. 2006). This Court agreed in *DiFelice,* noting that "placing retirement funds in *any* single-stock fund carries significant risks, and so would seem generally *imprudent* for ERISA purposes." 497 F.3d at 424.

The district court likewise recognized a "single stock fund carries significantly more risk than a diversified fund." (Dkt._437_at_66; *see also* 1/28/10_Tr._at_123.) And trust law generally forbids investing in single-stock funds. *See* Restatement (Third) of Trusts § 227 cmt. e (1992) ("Restatement") ("Because market pricing cannot be expected to recognize and reward a particular investor's failure to diversify, a trustee's acceptance of this type of risk cannot, without more, be justified on grounds of enhancing expected return.").

Moreover, the Nabisco Funds were even more risky than normal single-stock funds because of the "tobacco taint"—the risk that Nabisco would be responsible for tobacco lawsuit judgments. *See supra* at 7. This type of risk is a non-systematic risk, which "attach[es] to 'specific companies or securities independent of the general market.'" (Dkt._437_at_67.)

Based on RJR's duty to ensure each fund was properly diversified to avoid excessive risk, RJR was *required* to divest the Nabisco Funds from the Plan. Indeed, the need to diversify this single-stock option was particularly important because, as Tatum's experts conceded at trial, most participants in 401(k) plans pay no attention to their plan, so their investments are governed by "inertia." (1/15/10_Tr._at_141-44; 1/26/10 Tr._at_125-28.) For example, more than 40% of class members did not make a *single* voluntary transfer within the Plan from mid-1997 through 2002. (2/2/10_Tr._at_70-72.) As a result, maintaining the single-

stock Nabisco Funds as an investment option created precisely the sort of
unacceptable risk that ERISA's diversification provisions prohibit.  Because RJR
was *required* under ERISA to divest the Nabisco Funds because of their lack of
diversification, a hypothetical prudent fiduciary necessarily would have done so.

> **b.    The facts found by the district court establish a
> hypothetical prudent fiduciary would have divested
> the Nabisco Funds.**

Even if it were permissible under ERISA to maintain the highly-risky
Nabisco Funds in the Plan, the district court's factual findings show a hypothetical
prudent fiduciary would have sold the funds.  Notably, the Secretary of Labor
acknowledges the district court's findings of fact support a conclusion that a
prudent fiduciary would have eliminated the Nabisco Funds.  (Labor. Br. 25.)

The court found the most significant factor a hypothetical prudent fiduciary
would consider is the extreme risk of single-stock funds.  (Dkt._437_at_66-67.)
The court also found the Nabisco Funds were *even riskier* than an ordinary single-
stock fund.  (Dkt._437_at_68.)  Indeed, the facts available to RJR when it
purportedly made the decision to sell were dramatic.  The NGH and NA stocks had
*plummeted* between the spinoff and January 31, 2000, falling 60% and 28%,
respectively.  (Dkt._437_at_30.)  The fiduciaries were entitled—even obligated—
to defer to the market's evaluation of the value of the stocks.  The Seventh Circuit

has held that fiduciaries may, *as a matter of law*, rely on a stock's market price as

an indicator of the stock's future prospects:

> A trustee is not imprudent to assume that a major stock market …
> provides the best estimate of the value of the stocks traded on it that is
> available to him…. [I]t would be *hubris* for a trust company … to
> think it could predict United's future more accurately than the market
> could, and preposterous for a committee of union officials (the named
> fiduciary) to challenge the market's valuation.

*Summers*, 453 F.3d at 408. The Seventh Circuit emphasized that, "at *every* point in

the long slide of United's stock price, *that price was the best estimate … of the*

*company's value.*" *Id*. (second emphasis added). In short, ERISA flatly rejects

Tatum's argument that the fiduciaries were required to second-guess the market's

negative appraisal of the Nabisco stocks.

Moreover, there was a real possibility NGH would be responsible for

satisfying in excess of a billion dollars in judgments from tobacco lawsuits.

(Dkt._437_at_17-20.) That risk, in turn, placed the very future of NGH in doubt.

(*Id.*)

Holding such a high-risk investment is unquestionably imprudent unless the

investment offers a very high expected rate-of-return. Indeed, fiduciaries have a

duty to seek the lowest level of risk for a particular rate-of-return. *See* Restatement

§ 227 cmt. f ("Trustees, like other prudent investors, prefer (and, as fiduciaries,

ordinarily have a duty to seek) the lowest level of risk and cost for a particular

level of expected return."). Therefore, a hypothetical prudent fiduciary would

compare the risk associated with the Nabisco Funds to the likelihood of the value of those funds increasing in value.

But as the district court found, no public information suggested the Nabisco Funds were likely to rebound from their significant decline or outperform the stock market generally. (Dkt._437_at_73.) While analyst reports were generally favorable, it was "during a time when nearly all analyst reports were favorable," and the reports were not "unanimous in their recommendation." (*Id._at_68-69.*) These reports, "while positive, did not and *could not* counter the noted litigation risks, the continual decline in stock values, and the reality that no one could predict investor behavior with regard to the 'tobacco taint.'" (*Id._at_69* (emphasis added).) And there was undisputed testimony that even where positive, analysts' ratings of Nabisco were not statistically more positive than the ratings for the average stock in the market. (1/27/10_Tr_at_151-58.) Simply put, a handful of generic but favorable analyst reports did not even remotely offset the substantial risk associated with Nabisco's stocks.

Nor was there any public information that might have predicted the bidding war later caused by Icahn. (Dkt._437_at_72.) To the contrary, the court found investors would *not* have expected any restructuring of Nabisco because those efforts could jeopardize the tax-free status of the spinoff, resulting in significant losses for shareholders. (*Id._at_73-74.*) In short, there was no public information

-30-

to support a high, or even modest, rate-of-return on the Nabisco Funds; absent that information, an objectively prudent fiduciary necessarily would have divested those funds to eliminate the unacceptable risks to Plan participants.[7]

Tatum argues in response that the district court "failed to consider" other facts that are relevant under the "would have" causation standard. But those other facts conflict with the district court's findings. First, Tatum claims the district court failed to consider evidence that "absent a good reason to sell, investments should be maintained." (Tatum Br. 29-30.) But the district court found the high risk nature of the Nabisco Funds provided a compelling reason to sell. (Dkt._437_at_76.)

Next, Tatum claims the district court's opinion fails to discuss the testimony of various witnesses supporting Tatum's arguments. (Tatum Br. 29-34.) But none of that testimony refutes the evidence showing the extremely high risk of holding the Nabisco Funds.

Tatum also dismisses the district court's discussion of the efficient market hypothesis, claiming that even if a stock could not be expected to out-perform the

---

[7] The district court also pointed out that Tatum's reliance on analysts' reports and other publicly available information to suggest the stock price might rise ignores the efficiency of U.S. financial markets, which rapidly adjust the price of stocks in response to public information. (*Id._at_70*); *see also* Restatement § 227, reporters note ("Economic evidence shows that, from a typical investment perspective, the major capital markets of this country are highly efficient, in the sense that available information is rapidly digested and reflected in the market prices of securities.").

market, that does not mean the stock should be sold. (Tatum Br. 31-33.) But the district court found the Nabisco Funds' risks far exceeded the risk of the overall market (Dkt._437_at_66-68); thus, without expectations of above-market returns, the Nabisco Funds were clearly an imprudent investment that a prudent fiduciary would have removed from the Plan, because the same expected returns could be achieved with substantially lower risk through diversified funds.

Finally, Tatum argues the language from the June Amendment, which stated the Nabisco Funds should remain as frozen funds in the Plan, must be considered when assessing what a hypothetical fiduciary would have done. (Tatum Br. 28-29.) But although the violation of the June Amendment might give rise to a separate claim under ERISA (one Tatum expressly abandoned below[8]), that does not affect the causation analysis even under Tatum's "would have" standard—that *objective* analysis turns on whether removing the funds was prudent.

In sum, regardless of which party bears the burden of proof, the district court's factual findings demonstrate that a hypothetical prudent fiduciary would have sold the Nabisco Funds because of their lack of diversification, unacceptably high level of risk, and insufficient expected returns in light of the risk.

---

[8] Tatum's second amended complaint does not allege a violation of ERISA § 404(a)(1)(D) on the theory that eliminating the Nabisco Funds violated the terms of the June 1999 Plan. At trial, Tatum expressly stipulated he was not pursuing such a claim. (12/2/10_Tr_at_70-74, 95-97.)

Accordingly, even if this Court accepts Tatum's erroneous "would have" causation

standard, the Court should affirm.

## II.  THE DISTRICT COURT'S ERRONEOUS PROCEDURAL PRUDENCE RULING IS AN ALTERNATIVE GROUND FOR AFFIRMANCE.

This Court also should affirm because the district court erroneously

concluded RJR breached its duty of procedural prudence.  Applying the correct

legal standard to the facts found by the district court, there was no procedural

breach of duty.  This Court reviews *de novo* the district court's choice of legal

standard and its application.  *Murray*, 215 F.3d at 463.

### A.    The Procedural Prudence Standard is Context-Specific and the Required Investigation Varies Based on the Underlying Facts.

ERISA requires that a fiduciary act with prudence when making plan

decisions.  § 1104(a)(1)(B).  But "ERISA does not require that a fiduciary …

follow a detailed step by step process to analyze investment options."  *Bunch*, 532

F. Supp. 2d at 287.  Rather, the type of investigation necessary for any particular

decision is context-specific:

> [A] court must ask whether the fiduciary engaged in a reasoned
> decisionmaking process, consistent with that of a "prudent man acting
> in like capacity." … The evaluation is not a general one, but rather
> must "depend[] on the character and aim of the particular plan and
> decision at issue and the circumstances prevailing at the time."

*DiFelice*, 497 F.3d at 420 (second alteration in original).  Analyzing the "decision at issue" requires considering both the type of investment at issue and the fiduciary action under consideration.  *Id*.

No case has ever analyzed the prudence of an ERISA fiduciary's decision to divest a non-employer, single-stock fund.  Rather, cases that have evaluated the prudence of a fiduciary's process in deciding to divest a single-stock fund have generally arisen in the context of an *employer* fund.  Further, these cases involve funds that have lost significant value, and primarily focus on the prudence of a fiduciary's decision to maintain—rather than divest—an employer stock in light of the fiduciaries' knowledge that the company was in financial trouble.  *See, e.g.*, *id.*; *In re Schering-Plough Corp. ERISA Litig.*, 420 F.3d 231 (3d Cir. 2005).  In these "stock drop" cases, "courts have generally scrutinized to a greater degree the prudence of decisions reached by ERISA fiduciaries."  *Noa v. Keyser*, 519 F. Supp. 2d 481, 492 n.18 (D.N.J. 2007).  This greater scrutiny is deserved because a decision to maintain an employer, single-stock fund leaves plan participants exposed to an individual stock's inherent risk.

In contrast, decisions to *remove* a single-stock fund in light of a company's uncertain financial future are subjected to substantially less scrutiny.  *See id.*; *Bunch*, 555 F.3d at 10.  This is appropriate because divestment of single-stock

-34-

funds in the face of financial trouble *protects* participants and advances a

fiduciary's duty to "minimize the risk of large losses." § 1104(a)(1)(C).

It therefore naturally follows that a decision to *remove* a *non-employer*,

single-stock fund, like the Nabisco Funds, requires substantially less process than a

decision to *maintain* an *employer*, single-stock fund. Non-employer, single-stock

funds are imprudent *per se* because they are just as risky as employer funds but are

not exempt from ERISA's diversification requirement. *See supra* at 24-28.

*DiFelice* makes clear that the amount of process required is contextual. 497

F.3d at 420. Indeed, it is intuitive to consider both the type of investment and the

action under consideration when deciding what process is necessary. Consider, for

example, a situation where fiduciaries discovered that a fund in the company's

401(k) plan was invested solely in lottery tickets. Those fiduciaries would not

need *any* investigation before removing that fund. Requiring fiduciaries to

investigate such a "no brainer" decision to the same extent as a complex decision

would merely serve to incur unnecessary costs—costs that ultimately fall on the

plan and its participants. Likewise, it is similarly inconsistent with *DiFelice* to

require a fiduciary to investigate a decision to divest a plan of a highly risky and

*per se* imprudent non-employer, single-stock fund to the same degree as a fund that

ERISA encourages fiduciaries to offer.

Amici Curiae AARP and NELA contend (without any legal support) that the decision to remove a fund from a plan requires more scrutiny than the decision to add that fund because such decisions "are significantly more critical." (AARP/NELA Br. 14.)  But this illogical argument turns ERISA's core purpose on its head by focusing on maximizing potential investment returns instead of minimizing significant investment risk.  ERISA does *not* require that fiduciaries seek to maximize potential returns to plan participants, *see Wright*, 360 F.3d at 1100; *Bunch*, 532 F. Supp. 2d at 287, and doing so would expose many employees' retirement savings to grossly unreasonable risks.  Instead, ERISA seeks to protect participants' retirement funds from significant losses by requiring prudent, diversified investments.  § 1104(a)(1)(C).

Moreover, Amici's argument ignores that plan participants have no right under ERISA to have any particular investment fund in a retirement plan.  *Franklin v. First Union Corp.*, 84 F. Supp. 2d 720, 730-33 (E.D. Va. 2000).  Likewise, there is "nothing in the statute that requires plan fiduciaries to include any particular mix of investment vehicles in their plan."  *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009).  ERISA requires only that the participants have available to them a diverse group of prudent investment funds suitable for retirement planning.  *See id.*; *Becker v. Weinberg Grp., Inc. Pension Trust*, 473 F. Supp. 2d 48, 62 (D.D.C. 2007).

Therefore, the correct standard to evaluate the prudence of the process a fiduciary took in deciding to divest a non-employer, single-stock fund requires considerably less investigation than that required to maintain an employer, single-stock fund.

## B. Under the Correct Standard, the District Court's Findings Show Tatum Failed to Prove a Breach of Procedural Duty.

The district court erred when it found a breach of procedural duty by applying the standard other courts have adopted for *maintaining* an *employer*, single-stock fund. As explained above, that standard is far more rigorous than the standard needed to *remove* a *non-employer*, single-stock fund when the plan contains other prudent, diversified investment options. Had the district court properly applied standards specific to this case, rather than blindly adopting standards used in *employer* single-stock cases, it would not have found a procedural breach. This is demonstrated by the district court's own fact findings, which show RJR did far more analysis than is required to make such an easy decision.

### 1. RJR satisfied its procedural duties pre-spinoff.

When the fiduciaries decided in the spring of 1999 to remove the Nabisco Funds approximately six months after the spinoff, they engaged in a "reasoned decisionmaking process" based on an adequate analysis of the appropriate

-37-

considerations by well-qualified and experienced individuals. *DiFelice*, 497 F.3d at 420.

The district court found that the pre-spinoff decision was made after "a series of meetings" between March and June 1999 by an internal "working group." (Dkt._437_at_10-11.)  There is no dispute the working group was comprised of the "right" people, consisting of between 12 and 20 RN, NA, and RJR employees, who collectively represented considerable experience in benefits administration and a wide array of benefits specialties.  (Dkt._437_at_11 n.4; *see also* 1/19/10_Tr._at_105; 1/21/10_Tr._at_211-12; 1/25/10_Tr._at_43, 97-98.)  Many of these individuals were members of the administrative committees (the EBC, PIC, and the Benefits Administrative Committee ("BAC")[9]) responsible for the administration of the plan.  (Dkt._437_at_11 n.4; DX-2_at_RJR020121, 020125-26; 1/19/10_Tr._at_109-12.)  Representatives of the plan's outside record-keeper and the plan's internal advisor also participated.  (Dkt._437_at_11 n.4, 56.)  Those present also included two in-house ERISA attorneys and a paralegal responsible for providing legal support for RN's benefit program.  (Dkt._437_at_11 n.4, 55-56; 1/19/10_Tr._at_127; 1/25/10_Tr._at_98-99; 1/21/10_Tr._at_213.)  Outside ERISA

---

[9] The BAC was an administrative committee set up by the EBC to help administer the Plan and was a named fiduciary under the plan.  (1/14/10_Tr._at_65; DX-1_at_RJR000663.)

counsel was also present.  (Dkt._437_at_56.)  *See Noa*, 519 F. Supp. 2d at 491

(finding legal counsel's presence evidence of a "thorough investigation").

Further, the working group met at least three times between March and June

1999, and discussed a wide variety of issues.  (Dkt._437_at_10-11.)  The March

24, 1999 discussion regarding what to do with the Nabisco Funds in the RJR Plan

lasted approximately an hour.  (*Id.*_at_12; 1/25/10_Tr._at_42-43.)  During that

time, the group came to the consensus that the Nabisco Funds should be frozen in

the RJR Plan and eliminated approximately six months after the spinoff.

(Dkt._437_at_13.)  In coming to its recommendations, the working group

discussed various rationales, including:

- the Nabisco Funds would be non-employer, single-stock funds in the

  Plan and would not fall within the exemption to ERISA's diversification

  requirement for employer funds;

- the high risk of single-stock funds;

- non-employer, single-stock funds were only held in ERISA plans for

  limited, transitional periods and then only as frozen funds; and

- the added administrative complexity and costs of handling single-stock

  funds, particularly when they were not employer securities.

(*Id.*_at_12-13.)

However, after finding these facts, the district court concluded that the pre-spinoff decision was made with "virtually no discussion or analysis and was almost entirely based upon the assumptions of those present and not on research or investigation." (*Id.*_at_53-54.)  But the court failed to credit the working group with what they already knew and believed based upon their experience.  ERISA does not require fiduciaries to investigate and hire professionals to confirm well-founded knowledge.  *See, e.g.*, *DiFelice*, 497 F.3d at 421 n.5, 422 (crediting the fiduciaries' "*well-founded* belief" about the company's future); *Brieger v. Tellabs, Inc.*, 629 F. Supp. 2d 848, 862 (N.D. Ill. 2009) (crediting the fiduciaries' "intimate knowledge of Tellabs' business" and awareness that the Tellabs stock fund was the riskiest investment in the plan).

Indeed, the law and record at trial establish that the working group's well-founded beliefs were in fact accurate.  Non-employer, single-stock funds such as the Nabisco Funds:

- are not exempt from ERISA's diversification requirement, *see supra* at 24-28;

- are highly-risky (Dkt._437_at_66-67);

- are universally not maintained as *active* funds in ERISA plans

    (1/15/10_Tr._at_108-10; 1/28/10_Tr._at_122; 1/21/10_Tr._at_109-10;

1/26/10_Tr._at_151), and, even if *frozen*, are highly uncommon and are put in place by settlors, not fiduciaries[10] (1/26/10_Tr._at_148); and

- create additional costs as a result of added administrative burden, which costs ultimately would have been borne by the Plan participants.

(1/19/10_Tr._at_139; 1/25/10_Tr._at_101-02; DX-3_at_RJR_000924.)

The district court erred in discounting these factually accurate, well-founded beliefs simply because "they were not researched or discussed at length." (Dkt._437_at_57.)  Nothing in ERISA imposes such a standard.

The district court also erred by refusing to credit to the fiduciaries the various informal discussions that occurred after the March 1999 meetings. (*Id._*at_57-58.)  The court stated that none of the informal conversations "contemplated any formal action other than what had already been decided at the March meeting."  (*Id.*)  But many of these discussions occurred prior to the implementation and communication of the decision at issue.  For instance, there were numerous discussions following the March 24-25, 1999 meetings between members of the working group and members of the EBC and PIC where the freezing and later elimination of the Nabisco Funds was discussed.

---

[10] Tatum presented evidence of only seven instances prior to March 1999 in which a non-employer, single-stock fund was maintained in a 401(k) plan following a corporate spinoff or sale.  (1/26/10_Tr._at_82-86, 148.)  But he presented *no* evidence that *any* of these plans maintained a non-employer, single-stock fund as a result of *fiduciary* decision-making.

-41-

(1/21/10_Tr._at_213-17; 1/14/10_Tr._at_89; 1/13/10_Tr._at_198-99;

1/25/10_Tr._at_101.)  These included, among others, a "two to three hour

discussion."  (Dkt._437_at_13-14.)  Both parties' experts agreed that such informal

discussions are reasonable and common.  (1/15/10_Tr._at_66-67;

1/28/10_Tr._at_130-31.)  Most importantly, these informal discussions are the

same type credited in *DiFelice*, 497 F.3d at 421, and, therefore, should have been

credited here.

Considering that the Nabisco Funds were about to become non-employer,

single-stock funds, which would be highly risky, are not exempt from ERISA's

diversification requirement, and no other fiduciary has ever included a non-

employer, single-stock fund in a plan as a matter of fiduciary discretion, the

fiduciaries engaged in a sufficiently "reasoned decisionmaking process" and did

not breach their duty of procedural prudence.

### 2.    RJR satisfied its procedural duties post-spinoff.

The facts found by the district court and the undisputed evidence at trial also

establish that after the spinoff, the fiduciaries properly reconsidered the decision to

eliminate the Nabisco Funds from the Plan.

Post-spinoff, the fiduciaries monitored the performance of the Nabisco

Funds and discussed on numerous occasions whether and when to eliminate the

Funds from the Plan.  These discussions occurred during formal and informal

meetings among the members and staff of the EBC, PIC, and BAC—all experienced professionals—and included in-house lawyers responsible for benefits administration.  (Dkt._437_at_9-10, 16, 20-24, 28-29.)

For example, the fiduciaries discussed the elimination of the Nabisco Funds for 45-60 minutes on October 8, 1999 (*id._*at 21-23; 1/25/10_Tr._at_68, 110; 1/19/10_Tr._at_40), and again on October 14, 1999 (Dkt._437_at_24).  The PIC members who took part in these discussions had already received a 30 to 45 minute presentation on their fiduciary duties (*id._*at_9-10, 20-21), and were briefed twice previously by the PIC's outside investment advisor on the poor post-spinoff performance of the Nabisco Funds (*id._*at_16-17, 21).  Further, days before the October meetings, three PIC members had several informal discussions about the elimination of the funds, including one that lasted 30 minutes. (1/14/10_Tr._at_31-32; 1/20/10_Tr._at_177-80; 1/22/10_Tr._at_177-79; 1/25/10_Tr._at_166-69.)  Moreover, the trial record is replete with evidence of numerous additional informal conversations between the fiduciaries and their staff throughout the fall of 1999, wherein individuals discussed whether to eliminate the Nabisco Funds from the Plan.  (1/14/10_Tr._at_35-44, 129-132, 135; 1/20/10_Tr._at_136, 146-147; 1/22/10_Tr._at_183, 194-96; 1/25/10_Tr._at_77, 112; 1/26/10_Tr._at_208; 1/27/10_Tr._at_44-45.)  In fact, the fiduciaries continued

to monitor the stock prices of the Nabisco Funds up until their elimination as of February 1, 2000.  (Dkt._437_at_61.)

During these informal discussions and meetings, the fiduciaries discussed various considerations, including:

- the risk and inappropriateness of non-employer, single-stock funds;

- the decline in the NGH and NA share prices;

- that six months was a sufficient length of time to allow participants to decide when to sell the Nabisco Funds;

- that many participants had already made self-initiated sales of their Nabisco Funds holdings;

- the risk that retention would be seen as implied investment advice endorsing the Nabisco Funds; and

- the additional burden and expense of non-employer, single-stock funds.

(*Id.*_at_21-24.)

As with the pre-spinoff discussions, the district court faulted the fiduciaries for not investigating these factors beyond what they already knew.  (*Id.*_at_59-61.) But the facts found by the district court establish the fiduciaries' informed beliefs were well-founded:

- During the third quarter of 1999 alone, the NGH Fund declined 22.1% and the NA Fund declined 18.8%.  (*Id.*_at_29.)  By the time the Nabisco

-44-

Funds were eliminated from the Plan on January 31, 2000, the NGH
Fund had fallen 60% and the NA Fund 28% after the spinoff.
(*Id.*_at_30.)  And as the district court found, the "significant appreciation
in NGH and NA stock price that began in March 2000 was simply not
predictable before January 31, 2000."  (*Id.*_at_74.)

- Research between the October 8 and October 14 meetings "corroborated
  the group's beliefs that participants had begun to sell their NGH and NA
  funds after the announcement of the planned divestment."  (*Id.*_at_23.)
  By the end of September 1999, the number of employee participants in
  the NGH Fund dropped 15% and the number in the NA Fund dropped
  16%.  (*Id.*_at_24.)  The number of participants invested in those funds
  continued to drop until the divestment on January 31, 2000.

- Experts testified it is reasonable for prudent fiduciaries to be concerned
  about giving implied investment advice in adding or maintaining an
  investment option, even in light of potential disclaimers.
  (1/28/10_Tr._at_93-94; 1/15/10_Tr._at_145.)

Because the fiduciaries' beliefs were well-founded and correct, and the
investments at issues were poor-performing, non-employer, single-stock funds, the
district court should have given more credence to these discussions in analyzing
procedural prudence.

Furthermore, while the district court sharply criticized two quarterly statements to participants, which stated "regulations [did] not allow" RJR to keep the Nabisco Funds in the Plan (Dkt._437_at_58-59), the court's finding that "there are no regulations prohibiting single-stock funds of any kind in an ERISA plan" favors form over substance. While there may be no prohibitory "regulations," non-employer, single-stock funds are imprudent as a matter of law. *See supra* at 24-28. Indeed, Tatum presented no evidence that showed any ERISA fiduciary had *ever* made the discretionary decision to include a non-employer, single-stock fund. *See* note 10, *supra*. Further, the evidence was undisputed that this misstatement played no role in the decision to eliminate the funds. (*See* Dkt._437_at_10-14, 20-24, 53-61.)

In sum, applying the case-specific analysis outlined by this Court in *DiFelice*, the decision to divest the Nabisco Funds was so obvious that ERISA required the fiduciaries to engage in only minimal process before removal. The district court's fact findings show the fiduciaries far exceeded that minimal process and, therefore, engaged in a "reasoned decisionmaking process." Accordingly, even if this Court disagrees with the district court's causation holding, it should affirm on the alternative ground that Tatum failed to prove a breach of procedural prudence.

## III.   THE DISTRICT COURT'S ERRONEOUS CONCLUSION THAT RJR IS A FIDUCIARY IS AN ALTERNATIVE GROUND TO AFFIRM.

Only a fiduciary can be sued for breach of ERISA's fiduciary duties. 29 U.S.C. § 1132(a)(2). Whether a defendant is a fiduciary with respect to the challenged conduct is a "threshold question." *Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000). At trial, the only remaining defendants were the two RJR corporate employers. RJR argued it was not an ERISA fiduciary and therefore was entitled to judgment, but the district court rejected this argument, concluding RJR was a "functional fiduciary" under ERISA.

Fiduciary status is a question of law reviewed *de novo*. *Varity Corp. v. Howe*, 516 U.S. 489, 498 (1996). As explained below, the district court's functional fiduciary holding is erroneous and provides an alternative ground to affirm the judgment.

### A.   ERISA's Standard for Functional Fiduciary.

"Functional fiduciaries"—as opposed to fiduciaries named in the plan instrument—are those "who act as fiduciaries (though not explicitly denominated as such) by performing at least one of several enumerated functions with respect to a plan." *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 18 (1st Cir. 1998). ERISA defines a functional fiduciary as a person who "exercises any discretionary authority or discretionary control" over plan management, administration, or decision-making. 29 U.S.C. § 1002(21)(A). "[A] court must ask whether a person

-47-

is a fiduciary with respect to the particular activity at issue." *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61 (4th Cir. 1992).

Importantly, the mere fact named fiduciaries are company employees does not mean the company itself is a functional fiduciary. *See, e.g.*, *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 253-54 (1993); *Sommers Drug Stores Co. Emp. Profit Sharing Trust v. Corrigan Enters., Inc.*, 793 F.2d 1456, 1460 (5th Cir. 1986); *In re Mut. Funds Inv. Litig.*, 403 F. Supp. 2d 434, 447 n.15 (D. Md. 2005). Moreover, legal principles such as *respondeat superior* and common law agency do not apply to the acts of plan fiduciaries. *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 465 (7th Cir. 2010); *DiFelice v. U.S. Airways, Inc.*, 397 F. Supp. 2d 758, 780 (E.D. Va. 2005).

Instead, "an employee who performs services on behalf of her employer's benefit plan may serve two masters: the company (as an employee), and the plan (as a fiduciary or agent thereof)." *Mut. Funds*, 403 F. Supp. 2d at 447 n.15. When acting in their roles as fiduciaries, corporate employees are *not* acting on behalf of their employer. *NLRB v. Amax Coal Co., Div. of Amax, Inc.*, 453 U.S. 322, 330 (1981). To hold otherwise would create functional fiduciaries out of every employer since "ERISA anticipates that employees will serve on fiduciary committees." *Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1325 (9th Cir. 1985) (*per curiam*), *overruled en banc on other grounds by Cyr v. Reliance*

*Standard Life Ins. Co.*, 642 F.3d 1202, 1207 (9th Cir. 2011). But "the statute imposes liability on the employer only when and to the extent that the employer himself exercises the fiduciary responsibility allegedly breached." *Id.* Accordingly, corporate defendants are functional fiduciaries "only if [they] … caused the [named fiduciaries] to relinquish their independent discretion … and to follow instead the course prescribed by the defendants." *Sommers*, 793 F.2d at 1460.

### B.    RJR was Not a Functional Fiduciary With Regard to the Elimination of the Nabisco Funds.

The district court concluded RJR was a functional fiduciary with regard to the removal of the Nabisco Funds because it "was in control of the decision." (Dkt._437_at_43 n.18.) The court reasoned:

> The evidence at trial showed that RJR employees made and implemented the elimination decision before any official committee action was ever attempted and failed to use the committee designated in the Plan (the PIC and EBC) for any of the discretionary decisions.

(*Id.*) That holding was in error for several reasons.

First, the fact that RJR Nabisco employees used a working group in March 1999, instead of formal fiduciary committee meetings, does not mean the company was exercising its *own* authority as a functional fiduciary. The plan provided that RJR Nabisco had "no power to direct or modify any interpretations, determinations or decisions" with regard to the plan. (DX-1_§_10.04(a).) Instead, the RJR

-49-

Nabisco plan clearly granted exclusive fiduciary authority to the fiduciary committees. (*Id.*_§§_10.01(a), 10.02, 10.04(a), (d), 10.05(a).)  The working group was created and led by the plan fiduciaries. (1/14/10_Tr._at_81-82, 86-88; 1/19/10_Tr._at_105-06; 1/21/10_Tr._at_212-13; DX-5_at_RJR_000123-24; DX-6.)  The group was made up of plan fiduciaries and their support staff. (Dkt._437_at_11 n.4, 55 n.24; DX-2_at_RJR_020121-26; 1/19/10_Tr._at_105-12; 1/25/10_Tr._at_43, 97-98.)  And that working group communicated its recommendation to the plan fiduciaries, who approved it. (Dkt._437_at_13-14, 55_at n.24; 1/21/10_Tr._at_213-15; 1/14/10_Tr._at_89-90; 1/13/10_Tr._at_198-99; 1/25/10_Tr._at_101.)

Simply put, the district court did not find (and there is no evidence to support) that RJR Nabisco caused the plan fiduciaries "to relinquish their independent discretion … and to follow instead the course prescribed by [RJR]." *Sommers*, 793 F.2d at 1460.  The employees in the working group acted on behalf of the plan fiduciaries—in other words, those employees were wearing their fiduciary "hats," not their employee "hats," during those meetings. *See Taylor v. Peoples Natural Gas Co.*, 49 F.3d 982, 987 (3d Cir. 1995) (holding employer not liable for fiduciary breach because employee "performed his activities for the plan on behalf of the plan administrator … and not on behalf of the plan sponsor").  To permit an inference of corporate control merely because the working group

-50-

consisted of corporate employees "would vitiate the notion of limited fiduciary responsibility established by the 'to the extent' language in ERISA § 3(21)(A)." *Sommers*, 793 F.2d at 1460.

In any event, this pre-spinoff decision cannot be attributed to *RJR*. Even if the district court were correct that the working groups served the company, that company was *RJR Nabisco*. To be sure, there were some employees of the RJR subsidiary involved in the working group, but the undisputed evidence showed the working group was formed and led by RN executives (Dkt._437_at_11 n.4; 1/19/10_Tr._at_105-06; 1/21/10_Tr._at_212-13), met at the RN headquarters in New York (Dkt._437_at_10-11), reported its findings to RN executives (1/21/10_Tr._at 213-15; 1/14/10 Tr._at_89-90; 1/13/10_Tr._at_198-99; 1/25/10_Tr._at_101), and announced the divestiture decision to plan participants on RN letterhead (Dkt._437_at_14; DX-9; DX-19).

RJR Nabisco (RN), however, became Nabisco Group Holdings (NGH) upon the spinoff, and is not a defendant in this case. (1/14/10_Tr._at_80-81; DX-9.) Thus, even if the district court were correct, NGH and not RJR would be a functional fiduciary with regard to the March working group meetings and decision.

Regarding the post-spinoff period, the district court found a working group of RJR HR managers, corporate executives, and in-house legal staff decided on

October 8, 1999 "not to change anything about the planned divestment of the [Nabisco Funds]." (Dkt._437_at_21-23.) The district court concluded this decision (to do nothing) was attributable to RJR. (*Id._at_43 n.18.*)

Again, this conclusion is erroneous. The RJR Plan, like the pre-spinoff plan, gave no fiduciary power to the company and granted exclusive fiduciary authority to the various committees. (DX-21_§§_10.01(a), 10.02, 10.04(a), (d), 10.05(a).) There is no evidence RJR "caused the [fiduciaries] to relinquish their independent discretion … and to follow instead the course prescribed by" RJR. *Sommers*, 793 F.2d at 1460. The employees participating in the decision were either members of the Plan fiduciary committees or their support staff. (Dkt._437_at_9-10, 21 n.11; 1/19/10_Tr._at_37-39, 103, 164-66; 1/20/10_Tr._at_61-63, 70-71; DX-30.) The group also included the PIC's outside investment advisor. (1/20/10_Tr._at_70-71; 1/19/10_Tr._at_164-65.) Moreover, the working group ultimately reported its recommendations to the fiduciaries, which attempted to amend the Plan. (Dkt._437_at_28.) Simply put, there was no evidence these Plan fiduciaries had removed their fiduciary "hats" and were acting under RJR's authority.

Although it is true that RJR's CEO Andy Schindler inquired about the status of the Nabisco Funds and received information about the outcome of the October 8 meeting, these facts are not sufficient to establish RJR's control over the decision. Schindler and others testified he was not involved in deciding whether to eliminate

the Nabisco Funds. (1/20/10_Tr._at_182; 1/22/10_Tr._at_194). But even if he had exerted some influence, "[m]ere influence over the [fiduciary's] investment decisions … is not effective control over plan assets" where the fiduciary did not relinquish independent discretion. *Schloegel v. Boswell*, 994 F.2d 266, 271 (5th Cir. 1993); *see also Hecker*, 556 F.3d at 584 (explaining to be a functional fiduciary the actor must do more than "play[] a role" in the decision; she must exercise "final authority" over the decision); *Walsh v. Principal Life Ins. Co.*, 266 F.R.D. 232, 250 (S.D. Iowa 2010) ("[F]unctional fiduciary status … must involve actual control … and, therefore, cannot be based solely on an ambiguous degree of influence over another person who retains control.…") Accordingly, the group's actions are not attributable to RJR. *See, e.g.*, *Taylor*, 49 F.3d at 987; *Gelardi*, 761 F.2d at 1325.

In any event, to be a functional fiduciary, RJR must have actually exercised authority or control over a Plan decision. Because the functional fiduciary doctrine "imposes a fiduciary duty on those not named as a fiduciary, its reach is limited to circumstances where the individual actually exercises some authority." *Trustees of the Graphic Commc'ns Int'l Union Upper Midwest Local 1M Health & Welfare Plan v. Bjorkedal*, 516 F.3d 719, 733 (8th Cir. 2008). "An act of omission fails to satisfy the requirement that the individual *exercise* discretionary authority over plan assets." *Id.*; *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 914 (7th

-53-

Cir. 2013).  Here, the district court found the October working group failed to "change anything about the planned divestment of the funds."  (Dkt._437_at_22, 59-60.)  Thus, the working group did not take any action affecting the Plan; the group simply allowed the existing plan to divest the fund to go forward.  This inaction or omission cannot make RJR a functional fiduciary as a matter of law.

## IV.    THE DISTRICT COURT'S REJECTION OF PROFESSOR LYS' TESTIMONY IS NOT REVERSIBLE ERROR.

Tatum also argues the district court committed reversible error by excluding the testimony of Professor Thomas Lys with respect to causation.  This Court reviews the exclusion of expert testimony for an abuse of discretion.  *United States v. Davis*, 690 F.3d 226, 257 (4th Cir. 2012).  When a court excludes evidence during a bench trial, the decision is afforded even greater deference.  *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.*, 320 F.3d 1213, 1216 (11th Cir. 2003); *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 156 (3d Cir. 1999).

The district court's refusal to consider Professor Lys' testimony was not an abuse of discretion.  The court refused to consider that testimony only on the issue of procedural prudence, explaining that it "will not consider his analysis as relevant to the *procedural prudence* analysis."  (Dkt._437_at_52-53 n.23.)  On the causation element—where the district court found in RJR's favor—the court expressly considered and applied Lys' testimony.  (Dkt._437_at_63 n.27.)  Thus,

any exclusion of Lys' testimony did not affect the ruling challenged by Tatum on appeal, so any error was harmless.

Moreover, even with respect to procedural prudence, the district court did not *exclude* Lys' testimony. Rather, after allowing Lys to testify, the court found his testimony "unhelpful to a finding of what is required of a prudent fiduciary" because he conceded that he did not know the ERISA standard for fiduciaries. (Dkt._437_at_53 n.23.) In other words, the court's ruling went to the weight of Lys' testimony, not to its admissibility. *See United States v. Infelice*, 506 F.2d 1358, 1362 (7th Cir. 1974) (finding a court's statement that it "virtually disregarded" the evidence did not reflect upon the admissibility of the evidence, only its probative value).

A district court's decision regarding the weight of evidence is only disturbed based on clear error. *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 181 (1st Cir. 2009). Tatum fails to show the district court clearly erred by giving less weight in an ERISA case to testimony from a witness who *admitted* he was unfamiliar with the applicable ERISA standard.

Finally, even if the district court improperly excluded Lys' testimony with respect to procedural prudence, it is harmless error. The district court applied the standard advanced by Tatum expert Alan Biller for what factors a fiduciary should consider to determine whether to divest a fund from a plan. The standard

-55-

identified by Lys was the same standard identified by Biller and ultimately adopted by the district court.  (*Compare* Dkt._437_at_52 (adopting Biller's opinion as to what a fiduciary must do to decide to divest an investment option from a plan) *with* 1/21/10_Tr._at_35-41 (Lys testifying as to what a prudent investor would do).)  Thus, any error in excluding Lys' testimony was harmless.  *United States v. Davis*, 690 F.3d 226, 258 (4th Cir. 2012).

## V.    THE DISTRICT COURT CORRECTLY DISMISSED THE TWO PLAN COMMITTEES.

Tatum next challenges the district court's dismissal of the PIC and the EBC (collectively, the "Committees").  He argues they satisfy ERISA's statutory definition of "person."[11]  (Tatum Br. 44-49.)  This Court reviews a motion to dismiss *de novo*.  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

The district court correctly held that the claims against the Committees were subject to dismissal under the plain language of ERISA.  (Dkt._90_at_14-18.)  When a court interprets a statute, it begins "by examining the literal and plain language of the statute.  Absent explicit legislative intent to the contrary, the statute should be construed according to its plain and ordinary meaning."  *Carbon Fuel Co. v. USX Corp.*, 100 F.3d 1124, 1133 (4th Cir. 1996) (citation omitted).  Further, ERISA is a "comprehensive and reticulated statute," and its "carefully crafted and

---

[11] The Court need not reach this argument if it agrees with the district court's causation ruling or affirms the district court's judgment on procedural prudence grounds.

detailed enforcement scheme provides 'strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.'" *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251-53 (1993).

Tatum asserted a single claim against the Committees under ERISA § 502(a)(2), which permits participants to seek "appropriate relief under section 409." 29 U.S.C. § 1132(a)(2). Section 409, in turn, imposes liability on "[a]ny *person* who is a fiduciary with respect to a plan" who breaches his fiduciary duty. § 1109(a) (emphasis added). ERISA defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization." 29 U.S.C. § 1002(9). Committee is not included within this definition.

As the district court recognized (Dkt._90_at_17-18), the omission of "committee" from the definition of "person" cannot be a drafting oversight given the comprehensive nature of ERISA. Had Congress intended to impose liability against committees who were acting as fiduciaries, it would have included "committee" in the comprehensive definition of "person." But Congress's decision not to include "committee" demonstrates its intent not to impose liability against these types of fiduciaries. *Cf. Boucher v. Williams*, 13 F. Supp. 2d 84, 93 (D. Me. 1998) (holding plans are not subject to breach of fiduciary duty claims because Congress did not include plans within the statutory definition of "person"). Just as

-57-

§ 502(a) specifies who "may bring an action for particular kinds of relief," *Coyne & Delany Co. v. Blue Cross & Blue Shield of Va.*, 102 F.3d 712, 714 (4th Cir. 1996), so too § 409 limits *who* may be sued. Therefore, ERISA's plain language dictates the Committees are not proper defendants under § 502(a)(2).

Tatum attempts to shoehorn the Committees into ERISA's definition of "person" by arguing committees are either "unincorporated organizations" or "associations." (Tatum Br. 45.) But "[i]n interpreting the plain language of a statute, [the Court] give[s] the terms their ordinary, contemporary, common meaning." *Minor v. Bostwick Labs., Inc.*, 669 F.3d 428, 435 (4th Cir. 2013). Tatum's argument is contrary to the plain language of the statute and has been rejected by multiple courts. *See, e.g.*, *Taylor v. ANB Bancshares, Inc.*, No. 08-5170, 2010 WL 4054362, at *14 (W.D. Ark. Sept. 20, 2010); *Simmons v. Pilgrim*, No. 2:09-CV-121, 2010 WL 4683745, at *3 n.3 (N.D.W. Va. Nov. 10, 2010).

Further, Congress included "unincorporated organization" and "association" in the definition of "person" to ensure that entities structured as unincorporated businesses or associations (such as labor unions) were subject to ERISA. *See Minn. Laborers Health & Welfare Fund v. Scanlan*, 360 F.3d 925, 929 (8th Cir. 2004). Indeed, unlike "unincorporated organization" or "associations," corporate

committees do not have the capacity to sue or be sued.[12]  *Doe v. Bayer Corp.*, 344 F. Supp. 2d 466, 468-69 (M.D.N.C. 2004); *In re RCN Litig.*, No. 04-5068 (SRC), 2006 WL 753149, at *5 (D.N.J. Mar. 21, 2006) (granting a motion to dismiss an ERISA claim because a committee "is not, by itself, a legal entity having the capacity to sue or be sued").  Congress's decision to exclude committees makes sense because committees have no assets against which to satisfy a judgment, *Bayer Corp.*, 344 F. Supp. 2d at 468-69, and there is no basis for holding its members or the corporation liable for a judgment against the committee itself, *Madonia v. Blue Cross & Blue Shield of Va.*, 11 F.3d 444, 450 (4th Cir. 1993).

To be sure, the Committees are named fiduciaries under the Plan.  (PX-1_§_10.05.)  But Tatum ignores that the individual members of the Committees were also fiduciaries and likewise could have been sued.  *See* § 1002(9) (including "individual" within the category of persons liable under § 409(a)); *Stein v. Smith*, 270 F. Supp. 2d 157, 168-69 (D. Mass. 2003) (holding that when a plan states that a committee is a named fiduciary, the committee's members are treated as named fiduciaries under ERISA).  Tatum's fear that plan sponsors could evade the statute's requirements by naming a committee as a named fiduciary is unfounded,

---

[12] Tatum argues state law is irrelevant because it is preempted by ERISA.  (Tatum Br. 49 n.21.)  But he misses the point:  Congress' decision not to allow committees to be sued is consistent with the law generally.

as each member of that committee would face potential liability should they also be named in the suit.

The district court therefore did not err in holding the Committees were not subject to suit under § 502(a)(2).

## VI.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DENYING TATUM LEAVE TO AMEND HIS COMPLAINT.

Tatum next challenges the district court's denial of his second motion to amend the complaint.[13]  This Court reviews the denial of a motion to amend for an abuse of discretion.  *Franks v. Ross*, 313 F.3d 184, 192 (4th Cir. 2002).

The district court's denial of Tatum's motion was not an abuse of discretion. Tatum could have named the individual committee members in his initial complaint (either by name or as John Does subject to discovery concerning their identities).  But Tatum did not do so, nor did he seek to add those individual committee members before the limitations period expired.  Instead, Tatum's request came shortly after the district court dismissed the claims against the Committees, leaving only the corporate defendants—who ordinarily are not subject to ERISA suits—as remaining defendants.  (Dkts._91, 95.)  By then, the statute of limitations for Tatum's claims against the individual committee members had long expired, so Tatum argued the amendment should relate back to the first amended complaint under Fed. R. Civ. P. 15(c)(3).  (Dkt._96.)   The district court denied

---

[13] *See* note 11, *supra*.

-60-

Tatum's motion, holding the relations back doctrine could not apply because the individual committee members "could not reasonably have known" Tatum intended to sue them individually.  (Dkt._159_at_5.)  Tatum now contends the court erred because it focused on what Tatum could, but did not, plead in his First Amended Complaint ("FAC").  (Tatum Br. 51.)  This argument is meritless.

When a plaintiff seeks to add a defendant after the statute of limitation has expired, Rule 15(c)(3) permits the amendment to relate back to the original complaint if, *inter alia*, the new party "should have known that it would have originally been named a defendant 'but for a mistake concerning the identity of the proper party.'"  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 467 (4th Cir. 2007) (*en banc*).  While this test turns on the knowledge of the newly proposed party, Rule 15(c)(3) is not satisfied "[w]hen the original complaint and the plaintiff's conduct compel the conclusion that the failure to name the prospective defendant in the original complaint was the result of a fully informed decision."  *Krupski v. Costa Crociere*, 130 S. Ct. 2485, 2496 (2010).

The district court did not abuse its discretion in holding the committee members "could not reasonably have known" Tatum intended to sue them individually.  (Dkt._159_at_5.)  Nothing in the FAC suggests Tatum meant to name the committee members as defendants.  The FAC's only reference to the Committee members is that their identities were unknown.  (Dkt._3_¶13.)  It did

not allege the members were fiduciaries, were liable for any alleged breach, or would have been named defendants had their identities been known. Instead, it merely acknowledged their existence without any indication Tatum hoped to learn their identities and add them as individual defendants.

Tatum contends it was improper for the district court to focus on what he failed to plead in the FAC. (Tatum Br. 51-53.) This argument misses the point of the district court's holding. It is not that Tatum's failure to plead certain things in the FAC itself precluded future amendment; rather, it was the fact that the missing allegations in the FAC meant that the *committee members* reasonably concluded Tatum did not intend to assert any claims against them. (Dkt._159_at_5.)

Tatum also argues Rule 15(c)(3) is satisfied because the committee members knew they were *potentially* liable. (Tatum Br. 52.) But a party's knowledge that it could be liable for conduct described in a lawsuit is not the same as knowledge that the plaintiff intended to sue that person. *See Lundy v. Adamar of N.J., Inc.*, 34 F.3d 1173, 1183 (3d Cir. 1994). As the Third Circuit explained in *Lundy*, Rule 15(c)(3) is not satisfied where there is no evidence to suggest "the plaintiff did anything other than make a deliberate choice between potential defendants."[14] *Id.*

---

[14] Tatum's reliance on the magistrate judge's order regarding the attorney-client privilege is similarly misguided as the "Defendants" discussed in that order do not include the individual committee members, only the named defendants. (Dkt._156.)

Moreover, Tatum's conduct after the filing of the FAC reinforced that he did not intend to name the committee members as defendants in this suit. For almost four years after filing this action, Tatum made no effort to learn the committee member's names. (Dkt._57_¶¶3-5.) Contrary to Tatum's unsupported assertion (Tatum Br. 53), after Tatum filed the complaint RJR never refused to provide the names of the committee members. Rather, for years Tatum never asked; when he finally asked, RJR promptly provided the names. (Dkt._57_¶5.)

In sum, the district court did not abuse its discretion by finding the individual committee members "could not reasonably have known" before the limitations period expired that they were intended to be named as defendants. *Goodman*, 494 F.3d at 472; *Krupski*, 130 S. Ct. at 2496.

## CONCLUSION

This Court should affirm the judgment.[15]

                    Respectfully submitted,

                    /s/ Adam H. Charnes
                    Daniel R. Taylor
                    Adam H. Charnes
                    Richard D. Dietz
                    Chad D. Hansen
                    Thurston H. Webb
                    KILPATRICK TOWNSEND &

---

[15] If this Court reverses, it must remand for the district court to address, *inter alia*, remaining causation arguments, RJR's affirmative defenses, whether class members suffered a loss, damages, and RJR's motions to decertify the class.

STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC  27101
(336) 607-7300

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE-STYLE REQUIREMENT

1.　　This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(iii) because this brief contains 13,956 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.　　This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using MS Word 2010 in Times New Roman 14-point font.

　　　　This the 26th day of July, 2013.

/s/ Adam H. Charnes
Adam H. Charnes
KILPATRICK TOWNSEND &
　STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 607-7300

*Counsel for Appellees*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 26, 2013, I electronically filed the foregoing

**PAGE-PROOF BRIEF OF APPELLEE** with the Clerk of Court using the

CM/ECF System.  Counsel for all parties are registered CM/ECF users and will be

served with the foregoing document by the Court's CM/ECF System.


/s/ Adam H. Charnes
Adam H. Charnes
KILPATRICK TOWNSEND &
  STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 607-7300

*Counsel for Appellees*